## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| R.K., an individual, | |
| *Plaintiff,* | CIVIL ACTION |
| v. | NO. 25-1661 |
| CHOICE HOTELS INTERNATIONAL, INC., | |
| *Defendant.* | |

**Pappert, J.**                                                    **October 14, 2025**

### <u>MEMORANDUM</u>

R.K. sued Choice Hotels International, Inc., claiming it violated the Trafficking Victims Protection Reauthorization Act by profiting from her purported sex trafficking. R.K. alleges Choice knew or should have known that she was being trafficked at one of its hotels but did nothing to stop it. Choice moves to dismiss R.K.'s Complaint for failure to state a claim and the Court denies the motion.

### I

In 2015, twenty-year-old R.K.[1] met a sex trafficker. (Compl. ¶¶ 40, 50.) He "came to control every aspect of her life." (*Id.* ¶ 3.) He allegedly threatened, attacked,

---

[1]      R.K. requests a protective order "to permit her to proceed under a pseudonym." (Compl. ¶ 23, Dkt. No. 1.) Parties to a lawsuit typically must identify themselves. Fed. R. Civ. P. 10(a). But parties may proceed anonymously where a plaintiff shows "both (1) a fear of severe harm, and (2) that the fear of severe harm is reasonable." *Doe v. Megless*, 654 F.3d 404, 408 (3d Cir. 2011) (citation omitted). Courts must also assess an array of factors that "balance a plaintiff's interest and fear against the public's strong interest in an open litigation process." *See id.* at 408–09.

Given the nature of this case, R.K. is entitled to proceed under a pseudonym. Applying the factors in *Megless*, R.K.'s identity has already been kept confidential; she has a legitimate fear of additional harm should her name become known; the public has an interest in maintaining the confidentiality of sex-trafficking victims; and nothing suggests R.K. has illegitimate motives in proceeding anonymously. *See id.* at 409. Indeed, courts frequently allow TVPRA plaintiffs to

and beat her, forced her to use drugs, took her identification documents, and deprived her of "basic survival necessities" like "food, water, transportation, shelter, and clothing." *See* (*Id.* ¶¶ 41, 45).

For at least two years, R.K. was trafficked at the Radisson Hotel Valley Forge in King of Prussia, Pennsylvania. (*Id.* ¶¶ 3–4, 58). Choice has since acquired the Radisson, and R.K. alleges Choice's franchise relationship with the Radisson constitutes a venture under the TVPRA.[2] (*Id.* ¶26.) R.K.'s trafficker chose the Radisson because it offered a "convenient, anonymous, and relatively central" location. *See* (*Id.* ¶ 42). He made R.K. stand outside the hotel to solicit paying customers for sex. (*Id.*) R.K.'s trafficker also posted online advertisements of R.K. while connected to Choice's Wi-Fi. (*Id.* ¶ 43.) The customers had sex with R.K. in rooms her trafficker rented. (*Id.* ¶ 42.) He allegedly coerced her to do this "hundreds of times," forcing her to have sex with multiple men every day. *See* (*Id.* ¶¶ 5, 44, 57).

The owner of the Radisson purportedly aided in R.K.'s trafficking. (*Id.* ¶ 51.) He provided free rooms to the trafficker in exchange for sex with R.K. and other women being trafficked at this location and warned R.K.'s trafficker when law enforcement was on the property. (*Id.*)

R.K.'s trafficker interacted with Radisson's staff every day, and hotel staff observed R.K. countless times where she "appeared bruised, emaciated, unwashed,

---

proceed under pseudonyms. *See, e.g., Doe (J.T.A.) v. Wyndham Hotels & Resorts, Inc.*, No. 25-00687, 2025 WL 2731105, at *3 (D.N.J. Sept. 25, 2025); *Doe (K.R.D.) v. Wyndham Hotels & Resorts, Inc.*, No. 24-8174, 2025 WL 1166519, at *3 (D.N.J. Apr. 21, 2025).

Additionally, the parties may submit to the Court an agreed-upon protective order under Federal Rule of Civil Procedure 26(c) governing discovery.

[2]    The Complaint suggests that a different franchisor operated the Radisson at the time of R.K.'s trafficking, and Choice "retain[s] successor liability for the wrongful acts of its predecessor." (Compl. ¶ 26.)

sleep deprived and distraught." (*Id.* ¶ 52.)  They encountered other alleged "red flags" of R.K.'s trafficking, (*Id.* ¶ 55), such as:

- R.K.'s trafficker "[r]equesting . . . room[s] away from other guests";

- Obvious signs of illegal drug use;

- Frequent requests for linen changes in the rooms where R.K. was trafficked;

- Unusually large numbers of male visitors coming in and out of R.K.'s room;

- Women wearing clothing inappropriate for the weather;

- Loitering / Soliciting on hotel grounds.

(*Id.*)  Despite these indicia, hotel staff never called law enforcement or attempted to help R.K.  (*Id.* ¶ 53.)  And when police showed up, no one told them about R.K. or her trafficker.  *See* (*Id.* ¶ 54).

R.K. allegedly responded to her abuse by loudly fighting with her trafficker and begging for someone to help her.  (*Id.* ¶ 53.)  On one occasion, R.K. asked a security guard for help but was told to go back to her room.  (*Id.* ¶ 48.)  Eventually, R.K. escaped and went to the police, who took her to the Federal Bureau of Investigation.  *See* (*Id.* ¶¶ 9, 58).

## II

To avoid dismissal under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible if the plaintiff pleads facts from which the Court can infer "that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  Although

this "plausibility standard is not akin to a 'probability requirement,'" it demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

Assessing plausibility under *Twombly* and *Iqbal* is a three-step process. *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). Step one is to "take note of the elements the plaintiff must plead to state a claim." *Id.* (alterations omitted) (quoting *Iqbal*, 556 U.S. at 675). Next, the Court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 679). Finally, for all "well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (alteration in original) (quoting *Iqbal*, 556 U.S. at 679). If the well-pleaded facts do not nudge the "claims across the line from conceivable to plausible," the Court must dismiss the complaint. *Twombly*, 550 U.S. at 570.

III

Choice attaches to its motion a license agreement between Radisson and Valley Forge Colonial Limited Partnership and a declaration from Stuart Kreindler, a Vice President and Assistant General Counsel for Choice, purportedly to verify the authenticity of that agreement. (Mot. Ex. "A," Dkt. No. 12-4.) Choice contends that these documents show Choice gave its franchisee "day-to-day control over the Hotel." (Def.'s Mem. of L. in Supp. of Mot. at 10–11, Dkt. No. 12-1.) When "decid[ing] a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Schmidt v. Skolas*,

4

770 F.3d 241, 249 (3d Cir. 2014) (citation omitted).  Matters "extraneous to the pleadings" typically cannot be considered.  *Doe v. Princeton Univ.*, 30 F.4th 335, 324 (3d Cir. 2022) (citation omitted).  But a document "integral to or explicitly relied upon in the complaint . . . may be considered without converting the motion to dismiss into one for summary judgment."  *Id.*

Declarations attached to a motion to dismiss "clearly may not be considered at this stage."  *See Schmidt*, 770 F.3d at 249.  Nor will the Court at this stage consider the license agreement.  R.K.'s claims involve Choice's control of its branded locations, *see* (Compl. ¶¶ 94–112), but the license agreement is just one of "a variety of means" Choice uses to do that, *see* (*Id.* ¶ 104).  R.K. also never claims she saw the agreement; she alleges its contents "[u]pon information and belief."  (*Id.* ¶ 102); *see Schmidt*, 770 F.3d at 250 (rejecting the integral-documents exception because the plaintiff never saw the exhibit).  And it's not clear that a redacted contract from 1999 signifies how much control Choice would exert over the Radisson sixteen years later.  So "[t]he proper place to resolve [these] disputes is not on a motion to dismiss, but on a motion for summary judgment."  *Princeton*, 30 F.4th at 343.

## IV

Under the TVPRA, the plaintiff must be "a victim of a violation of this chapter." 18 U.S.C. § 1595(a); *see also A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 188 (E.D. Pa. 2020) ("Section 1595(a), by its terms, provides a civil remedy to a victim of, *inter alia*, sex trafficking."); *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 551–53 (7th Cir. 2023) (assessing first whether a "proper plaintiff" brought a § 1595 claim).  The referenced chapter prohibits sex trafficking, which applies in part to "[w]hoever knowingly"

"recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person" knowing or "in reckless disregard" to the fact that "force, threats of force, fraud, [or] coercion . . . will be used to cause the person to engage in a commercial sex act."  *See* 18 U.S.C. § 1591.

R.K. alleges her trafficker used physical violence and threats, among other things, to force her to have sex with men for money.  *See* (Compl. ¶¶ 3, 41, 51.)  She also claims the Radisson's owner participated in R.K.'s trafficking and helped her trafficker avoid detection.  *See* (*Id.* ¶ 51.)  R.K.'s trafficker and the Radisson's owner could plausibly be charged with criminal sex trafficking on those alleged facts.  *See G.G.*, 76 F.4th at 552–53 (finding that the plaintiff was a sex-trafficking victim because the defendant plausibly violated § 1591).

Choice argues that any allegations about the owner are "implausible" because R.K. also portrays the Radisson "somehow [as] an owner."[3]  (Def.'s Mem. of L. in Supp. of Mot. at 16.)  The Complaint doesn't read that way.  The cited allegations describe the "owner" as a person, not as a hotel.  A different reading wouldn't make sense—only a person can "provide[] free rooms . . . in exchange for sex."  (Compl. ¶ 51.)  Choice then claims the Complaint "calls for dismissal" because R.K. "does not name her trafficker, the purported 'owner' of the Hotel, or any of the staff that she alleged participated in her trafficking."  (Def.'s Mem. of L. in Supp. of Mot. at 17–18.)  But that's not a

---

[3]    Similarly, Choice asserts throughout its briefing that R.K.'s allegations are "inconsistent." (Def.'s Mem. of L. in Supp. of Mot. at 7, 16–17, 20, 26.)  For example, the Complaint uses "Defendant" and "Defendants," "venture" and "ventures," and "owner" and "franchisor."  *See* (*Id.* at 7, 9–10, 15, 19, 24, 26–27.)  These mistakes don't make the Complaint "indecipherable," though it could in aspects be clearer.  *See* (*Id.* at 7.)  In any event, the pleading's inconsistencies are not, at this stage, fatal.  *See Indep. Enters. Inc. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165, 1175 (3d Cir. 1997) (stating that Federal Rule of Civil Procedure 8(e)(2) "permits inconsistency in both legal and factual allegations").

6

requirement for stating a TVPRA claim.  *See* 18 U.S.C. § 1595(a); *A.B.*, 455 F. Supp. 3d

at 189 (listing the elements of a TVPRA claim); *see also Twombly*, 550 U.S. at 570

(requiring "only enough facts to state a claim to relief that is plausible on its face").

V

The TVPRA provides for "beneficiary liability" for a sex-trafficking victim

against "whoever knowingly benefits . . . financially or by receiving anything of value

from participation in a venture which that person knew or should have known has

engaged in" sex trafficking.  18 U.S.C. § 1595(a).  The Third Circuit Court of Appeals

has yet to construe the TVPRA, but district courts in this Circuit have held a

sex-trafficking victim states a claim for beneficiary liability by plausibly alleging the

defendant "(1) knowingly benefited financially or by receiving anything of value; (2)

from participation in a venture; (3) it knew or should have known has engaged in sex

trafficking under § 1591."  *A.B.*, 455 F. Supp. 3d at 189 (citation modified) (footnote

omitted).[4]

Choice argues for a standard adopted by the Eleventh Circuit Court of Appeals,

which requires a plaintiff to show the defendant "had constructive or actual knowledge

that the undertaking or enterprise violated the TVPRA as to the plaintiff."  *See Doe #1

v. Red Roof Inns, Inc.*, 21 F.4th 714, 719 (11th Cir. 2021).  But § 1595(a) says nothing

about violations or knowledge with respect to a particular person.  It only requires that

---

[4]    *See Doe (J.T.A.)*, 2025 WL 2731105, at *3; *Timko v. NSPA Lounge LLC*, No. 23-cv-1307, 2025 WL 2162470, at *8 (W.D. Pa. July 30, 2025); *A.B. v. Wyndham Hotel & Resorts, Inc.*, No. 24-CV-01588, 2025 WL 1920417, at *3 (M.D. Pa. July 11, 2025); *Doe (K.R.D.)*, 2025 WL 1166519, at *3; *Doe (M.J.J.) v. Wyndham Hotels & Resorts, Inc.*, No. 24-6490, 2025 WL 342092, at *2 (D.N.J. Jan. 30, 2025); *Doe (C.J.) v. Cotugno*, No. 23-02973, 2024 WL 4500994, at *3 (D.N.J. May 16, 2024); *E.B. v. Howard Johnson by Wyndam Newark Airport*, No. 21-2901, 2023 WL 12053001, at *6–7 (D.N.J. Dec. 29, 2023); *Doe (P.B.) v. Wyndham Hotels & Resorts, Inc.*, No. 23-1493, 2023 WL 8890229, at *4 (D.N.J. Dec. 26, 2023).

the defendant "knew or should have known" that the "venture . . . has engaged in an act in violation of this chapter." *See* 18 U.S.C. § 1595(a); *see also A.B.*, 455 F. Supp. 3d at 189 (similar).  Most courts recognize as much and do not require "that the defendant knew or should have known of the specific victim who has brought the civil action."[5] *G.G.*, 76 F.4th at 558; *see also Timko*, 2025 WL 2162470, at *11 (disagreeing with the "minority position" in *Red Roof*).

VI

A

R.K. alleges Choice profited by receiving a "steady stream of income" from "each and every room" R.K.'s trafficker rented.  (Compl. ¶ 81.)  Choice also purportedly benefited by "repeatedly collect[ing] data on R.K., her trafficker, and her 'johns'" from their stays at the hotel, "including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data." (*Id.* ¶ 83.)  In other words, R.K. alleges Choice knowingly benefited under the TVPRA by renting rooms to her trafficker and collecting data on those involved.  As nearly every court in this Circuit has found, that's all R.K. needs to allege to satisfy this element.  *See Doe (J.T.A.)*, 2025 WL 2731105, at *3 (finding that defendant-franchisors knowingly benefited by receiving profits from room rentals); *Timko*, 2025 WL 2162470, at *8–9 (same); *A.B.*, 2025 WL 1920417, at *4 (same); *Doe (K.R.D.)*, 2025 WL 1166519, at *3 (same); *Doe (M.J.J.)*, 2025 WL 342092, at *3 (same); *Cotugno*, 2024 WL 4500994,

---

[5]    Choice contends that "victim-specific knowledge" is required when a case "involves the trafficking of only one victim." (Def.'s Mem. of L. in Supp. of Mot. at 21 n.5 (quoting *G.G.*, 76 F.4th at 557).)  That contention comes from a case where "the ventures and the victims were one and the same," *see G.G.*, 76 F.4th at 557, which differs from what R.K. alleges, *see* (Compl. ¶¶ 19, 21, 26); (Pl.'s Opp'n to Mot. at 17–18, Dkt. No. 17).

at *3 (same); *E.B.*, 2023 WL 12053001, at *8 (same); *A.B.*, 455 F. Supp. 3d at 190–91 (same)[6]; *see also Doe v. Wyndham Hotels & Resorts, Inc.*, No. 24-CV-217, 2025 WL 824369, at *7 (S.D. Cal. Mar. 14, 2025) ("[T]he vast majority of district courts have found allegations similar to Plaintiff's sufficient to meet this element." (citation modified) (citation omitted)).

Choice argues that "aggregate benefits" are not enough because they don't "share a meaningful nexus with [R.K.'s] trafficking allegations," (Def.'s Mem. of L. in Supp. of Mot. at 28), relying on *K.H. v. Riti, Inc.*, which held that allegations of financial benefit alone were not sufficient to show that the defendant participated in a sex trafficking venture. No. 23-11682, 2024 WL 505063, at *4 (11th Cir. Feb. 9, 2024). *Riti*, however, concerned participation in a TVPRA venture, not whether the defendant knowingly benefited. *See id.* And § 1595 "says nothing about *why* the sex-trafficker provides any benefit to the participant-defendant." *G.G.*, 76 F.4th at 565. The text requires only that the defendant "receiv[es] anything of value." 18 U.S.C. § 1595(a); *see also United States v. Cook*, 782 F.3d 983, 988 (8th Cir. 2015) (stating that "anything of value" in § 1591(a)(2) "is extremely broad").

## B

### 1

R.K. and Choice disagree about what constitutes a TVPRA "venture." R.K. argues a "venture" is a "group of two or more individuals associated in fact," *see* (Pl.'s Opp'n to Mot. at 17–18 (quoting *Ricchio v. McLean*, 853 F.3d 553, 556 (1st Cir. 2017)), whereas Choice argues it's a "common undertaking or enterprise involving risk and

---

[6]    The only court to do otherwise never reached the "knowingly benefited" element. *See Doe (P.B.)*, 2023 WL 8890229, at *5 n.8.

potential profit," *see* (Def.'s Mem. of L. in Supp. of Mot. at 15 (quoting *Red Roof*, 21 F.4th at 719)).

R.K.'s proposal draws on § 1591, *see Ricchio*, 853 F.3d at 556, which defines "venture" but expressly limits that definition only to criminal sex trafficking. *See* 18 U.S.C. § 1591(e) (defining terms "[i]n this section"); *see also Red Roof*, 21 F.4th at 724 (rejecting § 1591's definition of "venture" for beneficiary liability); *G.G.*, 76 F.4th at 554 n.7 (same). Yet R.K. brings her claims under § 1595, and that provision never defines "venture." Without that definition, the term must be "interpret[ed] . . . consistent with [its] ordinary meaning . . . at the time Congress enacted" the TVPRA. *See United States v. Smukler*, 991 F.3d 472, 482 (3d Cir. 2021) (quoting *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018)). So a "venture" is "[a]n undertaking that involves risk; esp[ecially] a speculative commercial enterprise." *Venture*, *Black's Law Dictionary* (12th ed. 2024); *see also Red Roof*, 21 F.4th at 724 (defining "venture" as "an undertaking or enterprise involving risk and potential profit"); *Doe 1 v. Apple, Inc.*, 96 F.4th 403, 415–16 (D.C. Cir. 2024) (defining "venture" as a "business enterprise involving some risk in expectation of gain").

R.K. contends Choice had a commercial venture with the Radisson. *See* (Pl.'s Opp'n to Mot. at 17). A "commercial venture like running or expanding a business" is a venture under the TVPRA even if its "primary focus is not on sex trafficking." *G.G.*, 76 F.4th at 554 & n.8 (citation modified) (quoting *Red Roof*, 21 F.4th at 727). The Complaint allows for the inference that Choice and its franchisee shared a goal of maximizing revenue. *See* (Compl. ¶¶ 9, 94–112). Choice allegedly promoted and controlled the Radisson by "offer[ing] its brand public lodging services" and "shar[ing]

10

office space, employees, management, and policies." *See* (*Id*. ¶¶ 9, 24). Put another way, Choice's franchise relationship with the Radisson was a speculative commercial enterprise involving risk and profit. *See, e.g.*, *Timko*, 2025 WL 2162470, at *9–10 (finding a commercial venture based on a franchise relationship); *A.B.*, 2025 WL 1920417, at *4 (same); *Doe (K.R.D.)*, 2025 WL 1166519, at *3 ("[A] legal business entity—such as a hotel or a franchise relationship—can constitute a 'venture' for purposes of the statute when sex trafficking occurs within its operations and the defendant knowingly benefits from its continued existence.").

Choice argues the Complaint does not mention a "commercial venture" beyond a passing reference when discussing the hospitality industry. (Def.'s Reply at 9, Dkt. No. 18.) That is incorrect. The Complaint refers to a commercial venture involving its control and franchising of the Radisson. *See* (Compl. ¶¶ 21, 26, 115). Regardless, R.K.'s allegations suffice to show a business venture between Choice and its franchisee based on their shared goals. *See* (Compl. ¶¶ 9, 24, 94–112).[7]

2

Courts define "participation" in various ways. Some equate participation with "taking part." *Timko*, 2025 WL 2162470, at *11; *see also Red Roof*, 21 F.4th at 725 (same); *Participate*, *Black's Law Dictionary* (12th ed. 2024) (same). Others find it "where the participant provides assistance, support, or facilitation to the trafficker through a continuous business relationship that would allow an inference that the participant and trafficker have a tacit agreement." *G.G.*, 76 F.4th at 559. The rest see

---

[7]    R.K. seemingly alleges a second venture between her trafficker and Radisson's ownership and staff. The Court need not address the sufficiency of these allegations given the venture recognized in the case law.

little difference between the two. *Timko*, 2025 WL 2162470, at *11 (citing *Doe v. Wyndham Hotels & Resorts, Inc.*, No. 24-cv-04895, 2025 WL 1119736, at *4 (C.D. Cal. Mar. 5, 2025) (collecting cases)). No matter the approach, the plaintiff must plausibly allege facts that "connect the dots between the alleged trafficking and the franchisors." *Id.* (quoting *Doe*, 2025 WL 1119736, at *4); *see also E.B.*, 2023 WL 12053001, at *8 (same).

As Choice correctly points out, "it is generally more difficult to allege participation on the part of the franchisors because they are not the entities that own or operate the hotels; rather, they are one step removed from the franchisees and their employees." *Timko*, 2025 WL 2162470, at *10 (citation omitted); *see also G.G.*, 76 F.4th at 562 (same). Still, a plaintiff can connect the dots by "link[ing] the franchisors to the traffickers through the franchisors' oversight of the franchisees and hotel operations." *Timko*, 2025 WL 2162470, at *10 (alteration in original) (quoting *Doe*, 2025 WL 1119736, at *4). Sex-trafficking victims have done so by alleging "facts that demonstrate that the franchisors facilitated the trafficking through repeated renting of rooms and substantial oversight over the franchisees' hotel operations." *Doe*, 2025 WL 1119736, at *4 (citation modified) (citation omitted).

R.K. alleges Choice did both. It repeatedly rented rooms at the Radisson to R.K.'s trafficker for at least two years. (Compl. ¶¶ 42, 58.) Choice oversaw hotels like the Radisson with "highly specific and detailed brand standards, policies, and procedures." (*Id.* ¶ 26.) Those standards included "everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed,

to the types of funds accepted, to when, where and how guests should be greeted."[8]  (*Id.* ¶ 95.)  Choice was involved in the Radisson's daily operations and management, booking and room reservations, rates for room rentals, insurance coverage requirements, staffing decisions, training and orientation materials, vendors of goods and services, and policies on guest safety.  *See* (*Id.* ¶¶ 94–112).  And Choice allegedly had its own employees at the Radisson working at the front desk or in housekeeping.  (*Id.* ¶ 26.)

Choice contends that collecting rent from a trafficker isn't "participation" and that R.K. instead needs to allege "something more than . . . an ordinary buyer-seller transaction."  (Def.'s Mem. of L. in Supp. of Mot. at 18.)  Several courts say otherwise.  *See, e.g.*, *A.B.*, 2025 WL 1920417, at *4 (finding "participation" based on allegations that a franchisor "regularly rented rooms to" the plaintiff's trafficker); *Cotugno*, 2024 WL 4500994, at *4 (similar); *E.B.*, 2023 WL 12053001, at *8 (similar); *Doe v. Rickey Patel, LLC*, No. 20-60683, 2020 WL 6121939, at *5 (S.D. Fla. Sept. 30, 2020) (similar); *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 971 (S.D. Ohio 2019) (similar).  Even so, R.K. alleges more than just arms' length transactions between Choice and her trafficker.  R.K.'s trafficker interacted with the Radisson staff "[e]ach and every day" over a two-year period.  (Compl. ¶¶ 51, 58.)  That staff—some of whom were Choice employees—saw R.K. bruised and emaciated but did nothing to help.  *See* (*Id.* ¶¶ 26, 52, 54).  Combined with Choice's control over the Radisson, *see* (Compl. ¶¶ 94–112), these allegations connect the dots between Choice and R.K.'s trafficker.

---

[8]     Although this allegation is "[u]pon information and belief," see (Compl. ¶ 95), the Court accepts it as true because Choice's standard practices are "uniquely within [its] possession."  *See Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 107 n.31 (3d Cir. 2015).

*See, e.g.*, *Doe (J.T.A.)*, 2025 WL 2731105, at *3 (finding "participation" where a franchisor provided its franchisees with "operational support, use of trademarks, marketing services, and other resources"); *Timko*, 2025 WL 2162470, at *11 (finding "participation" where a franchisor "provided training, controlled maintenance, dictated suppliers, vendors, and technology, controlled online booking, maintained access to the [franchisee's] database and electronic systems, shared a central reservation, and . . . controlled pricing").

C

Courts agree that a defendant under § 1595 must have had at least constructive knowledge that the venture in question has engaged in an act in violation of § 1591. *G.G.*, 76 F.4th at 555 n.9. Choice's commercial venture with the Radisson plausibly did so through the Radisson's owner, who provided free rooms for R.K.'s trafficking and warned R.K.'s trafficker when police visited. *See, e.g.*, *Timko*, 2025 WL 2162470, at *8, *10–12 (finding a commercial venture engaged in trafficking through the acts of the franchisee's co-owner).

Constructive knowledge under the TVPRA is assessed under a negligence standard. *G.G.*, 76 F.4th at 555 n.9. Indeed, "[t]he phrase 'knew or should have known,' echoes common language used in describing an objective standard of negligence." *A.B.*, 455 F. Supp. 3d at 181 (footnote omitted). Courts diverge on what satisfies that standard. Some find constructive knowledge where the defendant had "general knowledge of sex trafficking in the hotel industry" and "fail[ed] to implement policies to combat sex trafficking" in the victim's case. *Timko*, 2025 WL 2162470, at *12 (quoting *Doe (K.E.C.) v. G6 Hosp., LLC*, 750 F. Supp. 3d 719, 736–37 (E.D. Tex. 2024)

14

(collecting cases)).  Others require "that the franchisor monitored the franchisee hotels or that staff reported sex trafficking activity to the franchisor."  *Id.* (citation omitted).

R.K. alleges that Choice knew about the prevalence of sex trafficking at its hotels and pledged to adopt "hotel-specific best practices for preventing sex trafficking."  *See* (Compl. ¶¶ 59, 60, 78).  But Choice failed to do so in full.  *See* (*Id.* ¶¶ 84, 88).  Choice also monitored and audited the Radisson.[9]  *See* (*Id.* ¶¶ 26, 51, 84, 94, 101, 104).  Hotel staff "regularly reported customer data and other indicators of trafficking" to Choice. (*Id.* ¶ 85.)  R.K. then infers Choice either had reports on R.K.'s trafficking or failed to identify her trafficking.  *See* (*Id.*).  Moreover, Choice allegedly compiled detailed information on its customers—including "room reservations, identification and payment information," and any "websites [they] visited"—which would have revealed two years of suspicious activity involving R.K., her trafficker, and "hundreds" of "johns."  *See* (*Id.* ¶¶ 6, 26, 57–58, 83, 103–05).  Set against this background, Choice allegedly should have known, detected, and responded to sex-trafficking trends like those in R.K.'s case.  *See A.B.*, 455 F. Supp. 3d at 193–94 (similar); *see also Martin v. Evans*, 711 A.2d 458, 461 (Pa. 1998) ("Negligence is the absence of ordinary case that a reasonable prudent person would exercise in the same or similar circumstances.").

Choice insists that red flag indicators of sex trafficking are not a basis for showing constructive knowledge.  (Def.'s Mem. of L. in Supp. of Mot. at 22–23.)  That is not so.  *See, e.g.*, *Doe (J.T.A.)*, 2025 WL 2731105, at *4 (finding constructive knowledge where a defendant-franchisor had "red flags" of sex trafficking "based on their

---

[9]    R.K. alleges Choice "failed to conduct background checks and additional investigations" on those "operat[ing] its branded properties."  (Compl. ¶ 85.)  It's unclear whether Choice's alleged failure extends to the owner or any other staff at the Radisson.

supervision and monitoring of" the hotel where the plaintiff was trafficked); *Timko*, 2025 WL 2162470, at *12–13 (similar); *Doe (K.R.D.)*, 2025 WL 1166519, at *3–4 (similar); *A.B.*, 2025 WL 1920417, at *5 (finding constructive knowledge where a defendant-franchisor "regularly inspected and audited the hotel" a hotel); *Doe (M.J.J.)*, 2025 WL 342092, at *4 (similar); *Cotugno*, 2024 WL 4500994, at *4–5 (similar); *E.B.*, 2023 WL 12053001, at *9–10 (similar); *A.B.*, 455 F. Supp. 3d at 193–94 (similar). Only one court has gone the other way, and the allegations there differ from R.K.'s. *Doe (P.B.)*, 2023 WL 8890229, at *4–5 (alleging "sex slavery is pervasive" and "takes place largely at hotels," sex trafficking occurred at hotels the defendant owned, and "online reviews posted to tripadvisor.com . . . opin[ed] that prostitution taking place onsite").

Choice cites other cases, but those too are distinguishable. In one, the plaintiff never plausibly alleged that a defendant-franchisor encountered red flags of her trafficking. *See B.J. v. G6 Hosp., LLC*, No. 22-cv-03765, 2023 WL 3569979, at *5 (N.D. Cal. May 19, 2023). Another only alleged that the defendant was generally aware that sex trafficking sometimes occurred at its hotel. *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020). A third didn't allege "visible signs of abuse, like bruising, or physical deterioration, like malnourishment" "screaming . . . heard from the plaintiff's hotel room," or violence toward the plaintiff or others. *See A.B. v. Interstate Mgmt. Co.*, 746 F. Supp. 3d 997, 1008 (D. Or. 2024); (Compl. ¶¶ 51–58). And the final two used *Red Roof*'s requirement of victim-specific knowledge. *See Riti*, 2024 WL 505063, at *3–4; *Doe (L.M.) v. 42 Hotel Raleigh, LLC*, 717 F. Supp. 3d 464, 469–73 (E.D.N.C. 2024).

VII

R.K. claims that in addition to being directly liable, Choice is vicariously liable for the acts and omissions of its franchisee and their employees. (Compl. ¶¶ 8, 26, 99.) Although the TVPRA is silent, courts in this Circuit allow for vicarious liability in TVPRA claims. *See, e.g.*, *Doe (J.T.A.)*, 2025 WL 2731105, at *4–5; *Timko*, 2025 WL 2162470, at *13–14; *A.B.*, 2025 WL 1920417, at *5–6; *Doe (K.R.D.)*, 2025 WL 1166519, at *4–5; *Doe (M.J.J.)*, 2025 WL 342092, at *5–6; *Cotugno*, 2024 WL 4500994, at *5; *E.B.*, 2023 WL 12053001, at *10–11; *Doe (P.B.)*, 2023 WL 8890229, at *5; *A.B.*, 455 F. Supp. 3d at 194–95. Choice responds that courts should avoid reading "secondary liability" into statutes. *See* (Def.'s Mem. of L. in Supp. of Mot. at 25–26 (quoting *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994))). But that case's holding "rested on" aiding and abetting liability under the Securities Exchange Act. *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1430–31 (3d Cir. 1994). Vicarious liability, by contrast, does "not expand[] the category of affirmative conduct proscribed under the relevant statute; rather [it] decide[s] on whose shoulders to place responsibility for conduct indisputably proscribed by the relevant statute." *Id.*

A

The next question is whether federal common law or Pennsylvania common law controls the vicarious liability analysis under the TVPRA. *Timko*, 2025 WL 2162470, at *13. Again, courts split. *Compare A.B.*, 455 F. Supp. 3d at 195 (applying Pennsylvania agency law) *with J.C. v. Choice Hotels Int'l, Inc.*, No. 20-cv-00155, 2020 WL 3035794, at *1 (N.D. Cal. June 5, 2020) (applying federal common law). The TVPRA says nothing

17

on which law applies, and the Supreme Court has stated that "federal courts should incorporate state law as the federal rule of decision unless application of the particular state law in question would frustrate specific objectives of the federal programs." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991) (citation modified) (citation omitted). Indeed, using "the readymade body of state law as the federal rule of decision" is "the prudent course . . . until Congress strikes a different accommodation." *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 717 (1979). So, either way, Pennsylvania law controls. *See S.C. v. Wyndham Hotels & Resorts, Inc.*, 728 F. Supp. 3d 771, 778–79 & n.43 (N.D. Ohio 2024) (finding federal common law on vicarious liability requires applying state law).

### B

R.K. alleges Choice and the Radisson had an agency relationship. (Pl.'s Opp'n to Mot. at 22.) Under Pennsylvania law, an agency relationship requires "the alleged master to have day-to-day control over the manner of the alleged servant's performance." *A.B.*, 455 F. Supp. 3d at 195 (citation modified) (quoting *Myszkowksi v. Penn Stroud Hotel, Inc.*, 634 A.2d 622, 626 (Pa. Super. Ct. 1993)). Courts have found vicarious liability under the TVPRA where "the hotel franchisor controlled a franchised hotel's staff training, set the franchised hotel's policies, regulated the building standards for the franchised hotel, conducted regular inspections of the franchised hotel, and controlled the franchised hotel's pricing." *A.B.*, 2025 WL 1920417, at *5.

R.K. alleges that Choice controlled training at the Radisson, (Compl. ¶¶ 33, 103–06), set its policies on guest safety, (*Id.* ¶ 87), provided signage on and in front of the Radisson, (*Id.* ¶ 96), regularly inspected the property, (*Id.* ¶ 102), and used a credit

processing system and centralized direct billing for its customers, (*Id.* ¶ 108). At this stage, that's good enough. *See, e.g.*, *Doe (J.T.A.)*, 2025 WL 2731105, at *4–5 (alleging a similar relationship between the defendant-franchisor and its franchisee); *A.B.*, 2025 WL 1920417, at *5 (same); *A.B.*, 455 F. Supp. 3d at 195–96 (same).[10]

## VIII

Choice lastly argues that at least some of R.K.'s allegations are time-barred. (Def.'s Mem. of L. in Supp. of Mot. at 30.)  Under the TVPRA, an adult victim[11] must bring a claim within "10 years after the cause of action arose."  18 U.S.C. § 1595(c)(1). A defendant can raise a statute of limitations defense by a Rule 12(b)(6) motion "only when the . . . defense is apparent on the face of the complaint."  *Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017).  R.K. alleges her trafficking began "in 2015" and continued "for at least two years."  *See* (Compl. ¶¶ 50, 58).  R.K. filed the Complaint on March 31, 2025, (Dkt. No. 1), placing most of her allegations within the TVPRA's ten-year limitations period.  R.K. also contends the continuing violation doctrine applies, (Pl.'s Opp'n to Mot. at 24–25), though the Court need not take up that issue yet.

An appropriate Order follows.

---

[10]    R.K. also contends that Choice is vicariously liable as a joint employer.  (Pl.'s Opp'n to Mot. at 23–24.)  Given that R.K. has plausibly alleged an agency relationship, she "is not required to show joint employment to state a claim for vicarious liability."  *A.B.*, 2025 WL 1920417, at *6 n.5 (collecting cases); *see also Anderson v. Finley Catering Co.*, 218 F. Supp. 3d 417, 422 (E.D. Pa. 2016) (denying a motion to dismiss a Title VII claim alleging a joint-employer theory because "discovery is often necessary . . . [to] define the contours of the employment relationship").

[11]    The TVPRA provides a different limitations period for minor victims, *see* 18 U.S.C. § 1595(c)(2), which does not apply to R.K., *see* (Compl. ¶ 40).

BY THE COURT:


***/s/ Gerald J. Pappert***
Gerald J. Pappert, J.