## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANNIA

| | |
|---|---|
| **R.K.,** an individual,<br><br>               Plaintiff,<br><br>    v.<br><br>**CHOICE HOTELS INTERNATIONAL, INC;**<br><br>**VALLEY FORGE COLONIAL, LLC;**<br><br>               Defendant. | Case No. 2:25-cv-01661<br><br>**JUDGE: GERALD J. PAPPERT**<br><br>**FIRST AMENDED COMPLAINT** |

### FIRST AMENDED COMPLAINT

COMES NOW, the Plaintiff R.K. ("Plaintiff" or "R.K."), by and through her undersigned counsel, and amends her complaint to make the following averments:

### INTRODUCTION

1.     Plaintiff R.K. is a survivor of human sex trafficking.

2.     R.K. was trafficked at the Radisson Hotel Valley Forge located at 1160 1st Avenue, King of Prussia, PA 19406 ("King of Prussia Radisson"), that is owned, supervised, managed, controlled, and / or operated by Defendant Choice Hotels International, Inc. ("Choice") ("Defendant Choice") and Defendant Valley Forge Colonial, LLC ("Valley Forge") ("Defendant Valley Forge") (collectively, "Defendants"). R.K. and her trafficker rented hotel rooms for one purpose—a location to engage in sex trafficking.

3.     R.K. interacted with the guard, front desk, and eventually the hotel manager. She begged them all for help.

4.     Defendants knew that human trafficking was happening at this hotel, along with Choice's other "branded" properties. R.K. escaped her trafficker and sought help from the security

1

guard who told R.K. to go back to her room.

5.      R.K. was forced to stand in front of the hotel looking for "johns" and it was obvious to anyone that she was being forced to sell herself for sex.

6.      Defendants participated in a joint venture or integrated enterprise with one another regarding the operation, control and franchising of the subject Radisson. This involved a common undertaking or a common enterprise, a community of interests, joint rights of control and management, which involved potential profit and risk. They shared office space, employees, management, and policies. Thus, Defendants are vicariously liable for the actions of one another regarding the operation, franchising, and control of the subject Radisson.

7.      R.K. escaped and asked the guard for help, telling her she was being held captive and sold for sex.  The guard told her to return to her room.

8.      R.K. asked the manager for help, telling him that the guard was keeping her from escaping.

9.      R.K. asked the front desk clerk for help to escape. The front desk employee did not help.

10.      At some point, R.K. escaped her trafficker and the prison of Defendants' hotel rooms going straight to the police who took her to the Federal Bureau of Investigation, who assisted her.

11.      R.K. has spent a considerable amount of time attempting to regain the life that was stripped away from her because of her trafficking.

12.      R.K. brings this lawsuit to hold Defendants accountable who knowingly benefited from her trafficking or who should have known they were benefitting from her trafficking.

2

## OVERVIEW OF TRAFFICKING

13.     A significant portion of all sex trafficking in the United States of America occurs within the hospitality industry at hotels and motels.

14.     For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. While traffickers indiscreetly paraded throughout hotels, hospitality giants stood on the sidelines and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from their trafficking ventures.

15.     Choice knew and should have known for decades that sex trafficking repeatedly occurs under its brand flags, including the King of Prussia Radisson.

16.     Valley Forge knew or should have known for decades that sex trafficking repeatedly occurs at its location(s), including the King of Prussia Radisson.

17.     Rather than taking timely and effective measures to thwart this epidemic, Defendants chose to ignore the open and obvious presence of sex trafficking on their branded properties, benefitting from the profit and fees created by rooms rented for this explicit and apparent purpose.

18.     The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[1] However, traffickers aren't the only profiteers. The hotel industry, including Choice, makes millions from participating in ventures by renting rooms where trafficking victims are sexually exploited night after night. Hotels and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims.

---

[1] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm /.

3

19. The hotel industry ignored human trafficking on their premises and thereby enabled human trafficking in the United States to flourish.

20. Choice and other members of the hospitality industry are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at the Choice's hotels worldwide and at their own properties, including the King of Prussia Radisson. Choice and others in the industry have access to much public information on the prevalence of human trafficking at hotels, including reports by, among others, the Polaris Project created for the use of the hospitality industry.

21. The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Choice and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite: continuing with business as usual, so that Choice and all industry participants continue to profit millions from participating in a commercial venture by renting rooms for human trafficking.

22. Defendants' decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of R.K. on their property.

23. R.K., a survivor of sex trafficking, brings this action for damages against Defendants pursuant to the Trafficking Victim Protection Reauthorization Act, 18 U.S.C. § 1595. Defendants knowingly benefitted from participation in a commercial business venture that involved the potential profits and losses that it knew or should have known to be engaging in sex trafficking acts in violation of 18 U.S.C. § 1591(a).

## PARTIES

24.     Plaintiff R.K. is a natural person and a resident and citizen of Kingsport, Tennessee.

25.     Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

    a.     Due to the sensitive and intimate nature of the issues, Plaintiff R.K. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym.[2]

    b.     Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[3] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[4] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.[5]

    c.     Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma for her family and friends if her true identity is revealed in the public record.

---

[3] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[4] Fed. R. Civ. P. 10(a).

[5] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

d. Plaintiff should not be compelled to disclose her identity.

e. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[6]

f. Moreover, Defendants will not be prejudiced. Plaintiff will reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

26. **<u>Defendant Choice Hotels International, Inc.</u>** is one of the largest hotel franchisors in the world and offers its brand public lodging services through its affiliates, subsidiaries, and franchisees. Choice is a Delaware corporation with its headquarters in Rockville, Maryland.

27. Choice maintains a registered agent in Ohio, and it can be served through its registered agent, United States Corporation Company, at 50 West Broad Street, Suite 1330, Columbus, OH 43215.

28. Choice acquired the Radisson and retained successor liability for the wrongful acts of its predecessor.

a. Choice owned, supervised, managed, controlled, and / or operated the King of

---

[6] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

6

Prussia Radisson at 1160 1st Avenue, King of Prussia, Pennsylvania, 19406.

b. Choice employees worked throughout Defendants' King of Prussia Radisson. Choice employees worked jobs including front desk and housekeeping. Choice is the principal with control over nearly every element of operations at Defendants' King of Prussia Radisson. Choice is liable, directly, vicariously, and/or indirectly through an agency relationship with the acts and/or omissions of the employees at its branded hotels, including Defendants' King of Prussia Radisson where R.K. was trafficked. Choice has an actual and apparent agency relationship with the physical property owners of the Defendants' King of Prussia Radisson to establish vicarious liability.

c. Choice controlled and dictated the actions and inactions of the King of Prussia Radisson through highly specific and detailed brand standards, policies, and procedures.

d. Choice knowingly benefited, or received something of value, from its ventures at the King of Prussia Radisson through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where R.K. was trafficked, as well as maintaining a positive public image for the King of Prussia Radisson. Choice also benefited from gathering personal data from the Wi-Fi it provided to customers including R.K. and her traffickers.

e. Choice is subject to the jurisdiction of this Court because it regularly conducts business in Pennsylvania, including through the operation of numerous hotels in Pennsylvania, such as the King of Prussia Radisson, contracting to supply services in Pennsylvania. Choice has derived substantial revenue from services

7

rendered in Pennsylvania, has caused injuries to R.K. in Pennsylvania, and profited from a commercial business venture which unlawfully permitted criminals to sell R.K. for commercial sex at the King of Prussia Radisson.

    f.   Whenever reference is made in this Complaint to any act, deed, or conduct of Choice, the allegation is that Choice engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Choice.

29.    **Defendant Valley Forge Colonial, LLC** is a wholly-owned private company that is a Choice Branded Hotel franchisee of the King of Prussia Radisson location at 1160 1st Avenue, King of Prussia, PA. Valley Forge is a Pennsylvania corporation with its headquarters in Moorestown, New Jersey.

30.    Valley Forge maintains a registered office in Nevada, and it can be served through its registered office, Corporation Service Company, at 6465 S Rainbow Blvd, Las Vegas, NV 89118.

31.    The King of Prussia Radisson is a Choice Branded Hotel franchised property:

    a.   As a hotel operator, Defendants control the training and policies for it hotels including the King of Prussia Radisson property R.K. was trafficked.

    b.   Choice receives a percentage of the gross room revenue from the money generated by the operations of all Choice hotels, include a percentage of the revenue generated from the rate charged for the rooms in which R.K. was sex trafficked at the King of Prussia Radisson.

    c.   Whenever reference is made in this Complaint to any act, deed, or conduct of Valley Forge, the allegation is that Valley Forge engaged in the act, deed,

or conduct by or through one or more of their officers, directors, agents, employees, or representative who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Valley Forge, where R.K. was trafficked.

## JURISDICTION AND VENUE

32.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

33.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1391(d).

34.      The Court has personal jurisdiction pursuant to the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA") and 18 U.S.C. § 2255, Child Abuse Victims' Rights Act.

## FACTUAL BACKGROUND

### INTRODUCTION

35.     R.K. brings her claims against Choice and Valley Forge for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18U.S.C. § 1595(a).

36.     The TVPRA prohibits Defendants from engaging in any venture they knew or should have known involves trafficking and thereby establishes a non-delegable duty of reasonable care to detect and avoid participation in and benefiting from what they know or should know involves trafficking.

37.     An overwhelming majority of commercial sex trafficking transactions occur within

9

hotels and motels, as traffickers use their rooms as the hub for their operations.[7] Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.

38. Hotels offer anonymity, non-traceability, privacy, and discretion, making them ideal venues for sex trafficking.

39. As part of its conspiracy, to save costs and continually reap millions of dollars in profits, Defendants generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding human trafficking (or suspected) at the branded properties. To the extent Defendants did create, adopt, implement, and enforce company-wide policies and procedures regarding human trafficking or suspected human trafficking at its branded properties, Defendants ignored the data and/or reporting it received regarding the human trafficking. Furthermore, Defendants did not train staff how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

40. Defendants ignored the data or reports it had or should have had regarding incidences of human trafficking, instead keeping no reports or data on suspected incidences or occurrences of human trafficking on its properties, the rate at which those occurrences changed as a result of implementing human trafficking policies and procedures, or the number of rooms that Defendants refused to rent or refunded as a result of identifying the venture as one engaged in trafficking. Defendants did not establish mandatory and secure reporting mechanisms at the point

---

[7] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_7840754

of sale.

41.    Defendants nonetheless kept reports and / or data on all its branded locations and knew or should have known that Defendants' King of Prussia Radisson was a hot bed of sex trafficking and criminal activity.

42.    Notwithstanding the data that demonstrated that Defendants' King of Prussia Radisson was a hot bed of sex trafficking and criminal activity, Defendants continued to own, supervise, manage, control, and / or operate Defendants' King of Prussia Radisson, profiting from ongoing sex trafficking and criminal activity.

43.    With little to no risk posed to traffickers seeking to use Defendants' rooms as a location to force victims like R.K. to engage in commercial sex against her will, the sex trade continues to thrive at Choice's branded properties. Everyday victims of human trafficking like R.K. are repeatedly exploited within the rooms of Choice's branded properties across the country, including at the property located at 1160 1st Avenue, King of Prussia, Pennsylvania 19406.

44.    Plaintiff's injuries are indivisible and cannot be separated. Plaintiff's injuries are the result of continued instances of ongoing violent traumatizing sexual exploitation.

45.    Defendants are jointly and severally liable for the Plaintiff's damages in this case.

### THE SEX TRAFFICKING OF PLAINTIFF R.K.

46.    R.K. met her trafficker when she was twenty (20) years old.

47.    R.K. was held captive and sold for sex by her trafficker.

48.    The King of Prussia Radisson provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with R.K.  R.K. was required to stand in front of the hotel and solicit these "johns."

49.    Throughout her trafficking, R.K.'s trafficker connected with "johns" by posting or

11

causing to be posted advertisements online advertising for R.K.'s availability for commercial sex. R.K.'s trafficker posted many of these advertisements and had conversations with "johns" while connected to Defendants' Wi-Fi.

50. During her captivity at Defendants' King of Prussia Radisson, R.K. was raped, and psychologically tormented, kidnapped, and imprisoned.

51. R.K. encountered the same staff on multiple occasions. R.K. asked a security guard for help to escape and she told R.K. to go back to her room.

**THE SEX TRAFFICKING OF R.K. AT DEFENDANTS' KING OF PRUSSIA RADISSON**

52. R.K. was trafficked at Defendants' King of Prussia Radisson located at 1160 1st Avenue, King of Prussia, Pennsylvania 19406. R.K. in 2015.

53. The staff at Defendants' King of Prussia Radisson were specifically asked for help to escape from R.K. a.  This included the front desk, the security guard and the manager.

54. Yet no one from Defendants' King of Prussia Radisson came to R.K.'s rescue by calling the authorities in any other way attempted to help.

55. Police regularly showed up at Defendants' King of Prussia Radisson due to trafficking activity and physical violence towards other victims from the numerous traffickers staying at this location, about which Defendants knew or should have known occurred.

56. Further, each stay at Defendants' King of Prussia Radisson resulted in several consistent red flags, including, but not limited to:

    a. Requesting a room away from other guests;

    b. Obvious signs of illegal drug use;

    c. Frequent requests for linen changes;

    d. Women wearing clothing inappropriate for the weather; and

12

e.  Loitering / Soliciting on hotel grounds.

57.  Defendants owned, supervised, managed, and / or controlled Defendants' King of Prussia Radisson during the time period of R.K.'s trafficking, profiting from her room rentals.

58.  Plaintiff was repeatedly raped and otherwise sexually abused at Defendants' King of Prussia Radisson.

59.  These red flags were open and obvious to anyone working at Defendants' King of Prussia Radisson.

**DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT ITS BRANDED LOCATIONS**

60.  Defendants are aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[8] The United Nations,[9] international non-profits,[10] and the U.S. Department of Homeland Security,[11] have documented this well-known epidemic of

---

[8] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3 /.

[9] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and analysis/tip/2021/GLOTiP_2020_15jan_web.pdf /. See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html /.

[10] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[11] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry /; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf /.

13

human trafficking for years and brought particular attention to the indispensable role of hotels. Defendants cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds its industry.

61.     For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for its hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

62.     Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[12] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[13] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

63.     Plaintiff on information and belief, Defendants have access to individual hotel

---

[12] *The Blue Heart Campaign,* UNITED NATIONS (2022), https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heinous%20crime /.
[13] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone /.

location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking. Defendants nevertheless do not share such information with other hotel locations, thereby preventing other hotel locations from acting to protect the victims of such suspected human traffickers.

64.     Defendants also have access to public police reports, news reports, and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

65.     Defendants have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

**DEFENDANTS FACILITATED THE TRAFFICKING OF R.K.**

66.     Choice is a signatory of the Code[14] and thereby promises to adopt these policies to combat trafficking. Yet, Choice, upon information and belief, has either failed to implement most, if not all, these policies, ignored the reporting of the criminal sex trafficking to which R.K. was forced and coerced into at Defendants' King of Prussia Radisson.

67.     Choice is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Choice publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Choice should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them or utilized the standards created to impact human sex trafficking instead of ignoring the reported data.

---

[14] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members /.

68.     Defendants profited from the sex trafficking of Plaintiff R.K. Defendants rented rooms to R.K.'s trafficker when they knew, or should have known, that human trafficking was prevalent within its branded properties and at the specific location where R.K. was trafficked. The hotel staff, especially front desk staff, at Defendants' property knew or should have known of the obvious signs of R.K.'s trafficking.

69.     Defendants benefited from the income that R.K.'s trafficker and "johns" bring to its hotel brands and specifically at 1160 1st Avenue, King of Prussia, Pennsylvania 19406.

70.     Choice has made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Choice should have been aware of human trafficking occurring at the location where R.K. was trafficked given Choice had access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

71.     Moreover, Defendants repeatedly collected data on R.K., her trafficker, and her "johns" from her stays at Defendants' King of Prussia Radisson, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Defendants' employees witnessed the obvious signs of R.K.'s trafficking. Defendants failed to take reasonable measures to stop sex trafficking from occurring in its hotels, instead ignoring the reported data of sex trafficking to continue to benefit from it if Choice had taken proper measures, R.K. and other victims like her, would not have been trafficked at its location.

72.     Choice discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at their properties, including the hotel where R.K. was trafficked. These policies included ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, alerts to hotels in high-risk areas or in proximity to high-risk events, and field-based associates who visit

16

hotels specifically to discuss human and sex trafficking issues.

73. Pursuant to these policies, branded location employees and property management, including the King of Prussia Radisson operated by Valley Forge, regularly reported customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations. The staff at the Property where R.K. was trafficked failed to institute reasonable policies and procedures.

74. In addition, Defendants had access to much of this data through the management of centralized data systems it required the branded properties to use, including but not limited to the property management, booking, credit processing, and information technology and internet systems. These systems, which Choice required its branded properties to use, including the King of Prussia Radisson operated by Valley Forge, were either defective in ensuring customer safety and, specifically, identifying and mitigating suspected and actual incidents of human trafficking on Choice's properties or were effective and Choice ignored the reporting.

75. A reasonably diligent hotel brand in Choice's position would have included policies and procedures to identify and mitigate guest safety issues related to human trafficking in its franchise agreements, brand standards, and systems standards. Upon information and belief, Defendants' branded properties, including the King of Prussia Radisson operated by Valley Forge, would have expected this material to be included in Choice policies and procedures. By failing to include such policies and procedures, Choice led the branded properties to be negligently managed.

76. Instead, Choice negligently required the branded properties, like the King of Prussia Radisson which Valley Forge operated, to adopt injurious procedures that allowed trafficking to continue and thrive at Choice's properties, such as failing to accurately identify customer complaints that raise red flags of trafficking and take meaningful steps to address them. Choice provided and operated defective systems for daily property operations, management, policies, procedures, and training

17

that were incapable of determining whether they were generating revenue as a result of renting rooms where victims of trafficking were harbored and sold for commercial sex.

77.     Defendants voluntarily undertook and assumed a duty to protect the safety of guests at the branded property where Plaintiff was trafficked, such as security, criminal activity, food safety, emergency response protocols, and fire equipment, among others.

78.     Defendants' did not exercise reasonable due diligence and care in selecting franchisees to operate its branded properties, including the King of Prussia Radisson. Choice failed to conduct background checks and additional investigations to identify customer safety and security risks. Choice failed to conduct investigations such as background checks and additional due diligence to identify whether they sold and licensed their systems and brands to a company able to secure customer safety and security risks.

79.     Choice negligently designed the layout and structure of the franchised property or approved the layout and design of the interior or exterior of the hotel property so that red flags of human trafficking were hidden.

80.     Choice failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to prevent sexual exploitation on its properties. Choice maintained its deficiencies to maximize profits by:

    a. Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

    b. Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

    c. Collecting and utilizing massive amounts of data from all of its branded

locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in its hotels even when the data showed sex trafficking or possible sex trafficking;

d.  Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyer, which Choice knew or should have known because of the relationship with the franchisee involving the potential for profit and loss;

e.  Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

f.  Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g.  Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on its properties.

81.  As a direct and proximate result of these egregious practices on the part of Choice, R.K. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CHOICE'S CONTROL OVER ITS BRAND HOTELS

82.  In the hotel industry, Choice is a major hotel corporation that holds, owns, manages, and operates trademarks, licenses, and standard operating systems for hotel brands. As a parent company with decades of expertise in the hotel industry, Choice has the power to provide property owners and franchisees with standard operating systems that control the daily operations and

19

management of Choice's branded properties, including the King of Prussia Radisson operated by Valley Forge.

83.    Upon information and belief, it is a standard practice in the hospitality industry, followed by Choice, for parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted to their franchisee's, including Defendant Valley Forge.

84.    Choice provides its branded properties, including Defendant Valley Forge, with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect experience consistent with the standards of the Choice hotel brand. The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

85.    Choice provides brand name recognition, a marketing campaign, and hotel listings in the Global Distribution System (GDS) and other online travel agency databases, as well as with access to its brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites. Thus, booking and room reservations are to a substantial extent controlled by Choice.[15] Choice sees booking and reservation trends, including those branded hotels where Plaintiff was trafficked.[16]

86.    The staffing decisions at the individual hotel locations are sufficiently controlled by Choice to render staff at those locations' agents and joint employees of the brand manager Choice

---

[15] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry /.

[16] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.

20

and the individual hotel locations, including Defendant Valley Forge.

87.     The staff at individual location, including the locations at which R.K. was trafficked, took affirmative actions, as agents of Choice, to provide lodging to individuals who the staff and Choice knew or should have known were engaged in human trafficking, therefore, upon information and belief, Choice and Valley Forge are directly and vicariously liable.

88.     Upon information and belief, Choice requires its branded hotel property franchisees, including the King of Prussia Radisson operated by Valley Forge, to use a property management system, which is linked to Choice's corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions, internet and technology, and guest safety.

89.     Essentially, Choice provides a hotel in a box. Branded property owners, including Valley Forge, only provide the physical property, while Choice provides everything else required to operate and manage the hotel down to the minute details of daily operation. Branded properties must follow Choice's strict standards to receive the right to operate one of Choice's brands such as Radisson, including the King of Prussia Radisson operated by Valley Forge.

90.     Upon information and belief, according to the relevant franchise agreements,[17] Choice may enforce their brand standards by means of periodic inspections of its brand hotel locations to monitor compliance. If Choice branded properties fail to comply with Choice standards, Choice may penalize properties including the King of Prussia Radisson operated by Valley Forge, with fees and with the ultimate threat of termination of the franchise agreement.

91.     Choice exercises day-to-day control over Defendants' King of Prussia Radisson

---

[17] Most franchise disclosure documents, which outline the policies and procedures of franchise agreements,    can be    accessed    publicly    for    free    by    making    an    account on https://fddexchange.com/view-fdd-docs /.

and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Defendants' King of Prussia implements and retains brand hotel control over, including control over Defendants' King of Prussia Radisson, where R.K. was trafficked, as either direct subsidiaries or under the terms of its franchise agreements.

92.     Upon information and belief, Choice controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

a. Requiring the branded locations, including the King of Prussia Radisson operated by Valley Forge, to use Choice's property management system;

b. Requiring branded locations, including the King of Prussia Radisson operated by Valley Forge, to keep audit reports and other records;

c. Conducting regular inspections, quality assurance evaluation reports, and audits for compliance with franchise agreement terms and Choice's corporate policies;

d. Gathering reports of data generated by branded locations including reservation, payment, and occupancy information through Choice's centralized systems;

e. Requiring the brands, including the King of Prussia Radisson operated by Valley Forge, to regularly report data regarding customer feedback to Choice;

f. Providing marketing requirements and standardized marketing services for the branded locations, including the King of Prussia Radisson operated by Valley Forge;

g. Regulating all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms;

h. Requiring branded hotels, , including the King of Prussia Radisson operated by

22

Valley Forge, to use approved vendors for internet services or other requirements for Wi-Fi access, security, filtering;

i. Providing training and orientation materials for branded property staff;

j. Requiring branded locations, including the King of Prussia Radisson operated by Valley Forge, to make modifications to the branded properties upon Choice's request and to refrain from make substantial changes to the branded property without Choice's permission;

k. Requiring branded properties, including the King of Prussia Radisson operated by Valley Forge, to comply with Choice's Human Rights Policy and other laws;

l. Regulating the rates for room rentals; and

m. Insurance coverage requirements.

93. Choice jointly with Valley Forge employs all staff located at Defendants' King of Prussia Radisson where R.K. was trafficked.

94. Choice manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Choice.

95. Choice controls uniform and required reservation, marketing, customer support systems and royalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Choice's website, and mentions across its corporate media channels.

96. Through its national sales team, Choice controls the credit processing system and the centralized direct billing at its brand hotels, including Defendants' King of Prussia Radisson where R.K. was trafficked.

23

97. Choice mandates branded properties, such as Valley Forge, sources through Choice's global distribution system. Choice mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including Defendants' King of Prussia Radisson where R.K. was trafficked.

98. Choice regulates property rate, inventory availability, and overall revenue management for the branded locations, like Valley Forge, by monitoring hotel booking data for trends and patterns.

99. Choice sets and controls Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including Defendants' King of Prussia Radisson where R.K. was trafficked.

100. Choice is the employer of the staff at its branded properties, including Defendants' King of Prussia Radisson. Choice is responsible for setting the core values and culture for all Choice employees. In addition, Choice sets forth policies for, and provides employee benefits.

**CAUSE OF ACTION**

**COUNT 1: 18 U.S.C. § 1595 ("TVPRA")**

101. Plaintiff incorporates each foregoing allegation.

102. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

103. Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this

24

duty by facilitating human trafficking through their participation in a commercial business venture that involved potential profits and risks and that involved the harboring of Plaintiff and her trafficker for the purposes of commercial sex induced by force, fraud, or coercion.

104.    Defendants benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion they received payment for rooms or received payments or kickbacks for internet usage, Defendants directly benefitted from the sex trafficking of Plaintiff. The actions, omissions, and/or commissions alleged in this pleading were the "but for" and proximate cause of Plaintiff's injuries and damages.

105.    Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendants' King of Prussia Radisson

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

   a. Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

   b.  Disgorgement of profits obtained through unjust enrichment;

   c. Restitution;

   d.  Statutory and/or treble damages, where available;

   e. Punitive damages;

   f. Attorneys' fees and expenses;

25

g. The costs of this action;

h. Pre- and post-judgment interest; and

i. Any other relief the Court or jury deems appropriate.

**JURY DEMAND**

Plaintiff hereby demands a trial by struck jury.

Dated: February 17, 2026                    Respectfully submitted,

*/s/ Penny L. Barrick*
Penny L. Barrick (0074110)
Steven C. Babin, Jr. (0093584)
Babin Law, LLC
10 West Broad Street, Suite 900
Columbus, Ohio 43215
T: 614-761-8800
E: Steven.babin@babinlaws.com
Penny.barrick@babinlaws.com

***Attorney for Plaintiff***